1441 Mobility Workx, LLC v. Unified Patents, LLC As Justice Marshall wrote 41 years ago in Marshall v. Jericho, the Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in the adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivation and the promotion of participation and dialogue by affected individuals in the decision-making process. The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. At the same time, it preserves both the appearance and reality of fairness, generating the feeling so important to a popular government that justice has been done. Two sentences later, the court continued, the requirement of neutrality has been jealously guarded by this court. In Toomey v. Ohio, the court reversed convictions rendered by the mayor of a town when the mayor's salary was paid in part by fees and costs levied by him acting in a judicial capacity. The court stated that the due process clause would not permit any procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant or might lead him not to hold the balance nice, clear, and true between the state and the accused. Mr. Randall, this is Judge Dyke. I have a question about, as I understand, you have two theories here as to why there's a due process violation. One of these is that APJs have an incentive to initiate IPR proceedings because it would potentially increase their bonus by giving them more decisional points or whatever the right phrase is. And the government on page 39 of its brief says, well, there is no such incentive because there are plenty of cases in the ex parte area where they can earn decisional points. And I don't see that in your reply brief that you responded to that. Is it not the case that if the APJs want to earn additional decisional points, they don't have to do that by initiating IPRs? They can do it simply by addressing ex parte appeals? Thank you, Your Honor. There is nothing in the record to support the director's statement. What is in the record indicates that certain judges or APJs are only responsible for ex parte appeals and certain judges are only responsible for AIA proceedings and inter parties review appeals. So there's nothing to indicate what the total number of point count or decisional unit counts are. In fact, I believe the TTAB hired something like 260 judges since the beginning of the AIA proceedings. To get just a fully satisfactory rating, that would require something like over 20,000 total decisional units for that body of APJs that were hired to handle AIA proceedings. There's nothing in the record to indicate that if you took away 10, 20, 30 percent of those cases or more, that there would be sufficient decisional units within the TTAB to support and continue the APJs that fell short. I'm not quite understanding what you're saying. The statistics issued annually by the PTO indicate that there is a substantial backlog of ex parte cases, correct? There is a substantial backlog of ex parte cases, but for ex parte cases, you also only get one decisional unit per case, whereas for other cases, you get a much higher decisional unit count. For example, in the old inter-parties re-exam, there would be four decisional units given. Okay. Wait. I understand that point, but just stick with me for a moment. You agree that there is a backlog of ex parte appeals. Are you saying that the APJs cannot earn decisional units by adjudicating those cases? What I'm saying is that the default is that APJs are divided between the ex parte and the AIA proceedings. A APJ, my understanding, can ask for cases on the other side. That does not mean they will be given those cases. So, what you're saying is, and I want to make sure I understand the follow-up, this is Judge Schall to follow up Judge Dyke's question. We have X number of APJs at the board, and half of them say only decide inter-parties cases, and half of them only decide ex parte cases, and they never cross over. Is that correct? Correct. What I'm saying is that if you look at the standard operating procedure for assigning cases by the board at Appendix 4351 through Appendix 4366, that standard operating procedure identifies a preferred mechanism for assigning cases, and in that document, it specifically says that at Appendix 4355, a judge who is assigned to be paneled on a case in other jurisdictions of the board, e.g., a judge assigned to handle re-examination appeals and or AIA proceedings is not automatically paneled on ex parte appeals. So, they have to actually go and request an ex parte appeal. Okay, but... They may or may not be given those. Is there... Have you done anything to establish that they couldn't earn the decisional unit by requesting the ex parte appeal? So, currently the record does not indicate one way or another whether judges are getting ex parte cases, to what extent judges are getting ex parte cases, if their workload in the AIA trial space were to decrease. But with 200 judges, which my understanding is significantly greater than historic number of judges handling the ex parte cases, all of a sudden we're out of work, the backlog would presumably go down fairly quickly. Okay, but it sounds to me that since you say the record doesn't establish this, that you perhaps haven't made your case that there's an incentive on the part of APJs to initiate post-grant proceedings in order to earn decisional units, which is part of your theory. Well, Your Honor, I would respectively disagree. The APJs are given decisional units to handle APJs. There is an incentive for them to institute those IPRs in order to get more decisional units when the final written decision comes due, and in fact... Decisional units elsewhere? There is no indication that there... No, no, no, no, you're not answering my question. I'm asking you a question. Is there an incentive to initiate if they can earn the decisional units elsewhere? Yes, because the APJs are judged on whether they meet a variety of criteria, and two of them... No, no, you're not answering my question. This is a hypothetical. If we conclude that APJs can earn decisional units elsewhere, then there's no incentive to initiate, correct? I do not believe that to be the case, Your Honor. I respectfully disagree. Well, is the earning of decisional units the same whether the case is decided as an ex parte or an IPR? The decisional units are not the same. Decisional units for ex parte are one decisional unit according to PTO documents, whereas, for example, an inter parties review might be four decisional units, whereas the documents that have been produced by the government do not state what the decisional units are actually awarded by the patent office for either the institution decision or the final written decision. What they say is basically it's subject to an award... Please continue that thought. There was a disconnect somewhere. So the documents that have been produced, the FOIA documents that have been produced by the PTO do not indicate the exact number of decisional units actually awarded for institution decisions or for final written decisions in AIA proceedings. What they indicate is that management decisional units are going to award based on complexity of the case. Okay. Could I ask you a question, Judge Dyke, again, a question about your other theory, which is that there's an incentive to initiate because it brings more revenue to the agency, and yet there's a somewhat similar case from the D.C. that this theory that you're articulating doesn't work. Aren't we in a situation where congressional appropriations determine the revenue of the agency and not the fees directly? So 35 U.S.C. 42 provides all fees paid by the director and all appropriations for defraying the costs of the activities the Patent and Trademark Office will be credited to the Patent and Trademark Office appropriation account in the Treasury of the United States. And so all fees are credited to the appropriation account for the United States Patent and Trademark Office. And then those fees, according to 35 U.S.C. section 42, subsection C1, it says to the extent that the accounts provided in advance of appropriations acts, fees authorized by this title or any other act to be charged or established by the director shall be collected by and shall be subject, be available to the director to carry out the activities of the Patent and Trademark Office. So basically what used to happen is what you're suggesting where there was basically a general appropriations, the appropriations may not match the fees, and the fees went into the general fund. Now the appropriations for the last several years at the Patent Office that the director has matched what the revenues are. So all of the revenues, all of the revenues. There still has to be an appropriation, right? There does have to be an appropriations. There has to be a provision to appropriate the accounts that have been received, right? Well, the appropriation never goes into the general fund. The appropriations go into a special account designated for the Patent Office. So basically. You're not answering my question. Is it not. I'm sorry. That there has to be an appropriation, even though you contend that the appropriation has recently been in the amount of the fees collected. There does have to be an appropriations. It's my general recollection that at least since the beginning of the America Invents Act, the income to the office on the fees, on the filing fees and so on. Is that incorrect? That is correct statement that you made. Okay. I have a briefly, I'd like to make a couple of statements on regarding the substantial evidence issue on the triggering issue. If you want to hear on that or I can proceed for another couple of minutes. So in this case, obviously, and in all constitutional cases, there is a constitutional avoidance doctrine. And so mobility recognizes the importance of deciding constitutional issues and is willing to withdraw claim seven. And that would, from this appeal, and that would basically allow the court by concluding that claims one, there isn't substantial evidence to support claims one, two, four and five in the record. The unpatentability of those claims would allow it to avoid the constitutional issues that mobility has raised. So the claims in the case require a ghost mobile node that creates replica IP messages on behalf of a mobile node. The claim goes on to say that the ghost mobile node handling signaling required to allocate resources and initiate mobility on behalf of the mobile node, the ghost mobile node triggering signals based on the predicted physical location of such mobile node or distance with relation to at least one foreign agent. So the appellee relies on an agent to satisfy this ghost mobile node limitation. But all of the submitted evidence and board's findings make clear that according to the teachings of Lew, the mobile node itself and not the agent triggers the signals that allocate resources and initiate mobility on behalf of the mobile node. Thus, no reasonable mind could conclude Lew's agent is the entity in the Lew communication network that triggers signaling to allocate resources and initiate mobility. For example, a review of the board's factual findings regarding the 417 patent informed on this issue. Specifically, the board found that with respect to the 417 that a ghost mobile node acts on behalf of the mobile node and can be virtual node and need not reside at the same physical location as the mobile node. The board went on to indicate that the ghost mobile node predicted future state of the mobile node may be based upon, for example, an estimated location, trajectory or speed of the mobile node. Based on this predicted future state, the ghost mobile node determines which foreign agent is likely to serve the mobile node next communication link and the signals that that foreign agent accordingly. This signal can be a registration request to cause an allocation of communication resources the same way as would be performed in mobile node with physically present in the foreign agent's request. Then, when the board went on to discuss the Lew reference, it basically defined that the mobile terminal sends the MF agent assignment request to its M agent 50 with an address of the new location it's traveling to. The assignment request from this mobile terminal 55, the board found is a request to establish i.e. pre-assign an MF agent 52 at the location the mobile terminal is traveling to so that the necessary services and data are ready for the mobile terminal when it arrives at the new location. The entity that the appellate points to, the M agent 50, simply registers that request and forwards it to the remote MF agent manager 62 at the new location. This is spelled out at the board's opinion at appendix 12-13. We respectfully submit that the board's factual findings regarding the MF agent itself and the phone sending the assignment request which initiates the entire registration process is the signal, basically that the phone is what is triggering the signaling that's required by the claim and not the MF agent or the M agent as the appellate argues. Okay, thank you. We will save you rebuttal time. Let's hear, thank you, Mr. Randall. Let's hear first from the government, Ms. Karasvang. May it please the court, I'm Dana Karasvang for the government and I'd like to address the constitutional issues. As you know, I'm sharing time with Council for Unified Patents. I'd like to start with the structural due process argument which is waived because it was not raised before the agency. Let's just assume it's not waived since you're here and let's hear the due process argument. Sure, so there are three core facts that we all know to be true that are in the record and that are enough for the government to prevail in this case. APJs don't make more money if they institute. An institution decision counts just the same as a non-institution decision in the performance reviews. Let's go straight to the bonus question on productivity and not on institute but on productivity which of course flows from institution. What is the government's response to the fact we federal judges, we work very hard. We don't get a bonus if we decide more cases in a period of time. How and if there is precedent which really is sort of hard to overcome, how do you overcome the answer that seems undisputed that the bonus calculation depends on productivity? The bonus calculation depends on, it's true, the number of cases that APJ decides in addition to other factors but it's not unconstitutional to say that people have to do a certain amount of work to get a bonus. There is plenty of work in the PTAB for everybody. But that's not the bonus structure. The bonus structure, I saw that that's your argument that they wouldn't run out of work but your briefs, the briefs say that doing certain kinds of work earns more points than other kinds of work and that the bonus is measured by these points of productivity. This is what I find troubling. How does the government resolve that with the due process precedent which seems to weigh against this position? Your Honor, I think there's a misunderstanding about how these decisional units work. So it is true that some kinds of work get more decisional units than other kinds of work but that is because some things take more time than other things. So the goal with the decisional unit is that it should equalize the amount of time a task takes. But why isn't that covered by the salary? That's what troubles me. There's something on top of the ordinary salary for people who are acting as judges depending on these other factors. So it's not unconstitutional to have a system in which people who work hard and do good work get bonuses. We're talking about judging. We're talking about due process law, not whether if you work hard or you get paid more. Okay. Ms. Kersvang, are you here? Yes, I am. Okay. Let's take up with whatever the sentence we interrupted you in the middle of. You see what's troubling me. Yes. So nothing in the institution, nothing in the bonus process depends on the outcome of the institution decision. If you decide to institute a case, the APJ may or may not get that trial. But if they decide not to institute or they don't get the trial, they get another case right away. Judges are awarded decisional units for ex parte cases. You can see that in Appendix 4043. And there's plenty of work for these judges to get all of the decisional units that they want. That's really not the question that I'm trying to probe. Not that these are straightforward, honest APJs trying to do a job, but how you reconcile with the tradition of due process of law when an agency sets up a quasi-judicial structure or Congress sets it up to essentially to replace judicial proceedings and, in fact, to provide an estoppel in judicial proceedings to nonetheless adopt procedures which we know would not be available to the third branch of government. So perhaps it's helpful here to look at the cases and to look at what the Supreme Court has told us does raise a problem. That is the Toomey situation where we have a decision maker who, when he decides the case, some of the money he gets, some of the money when he opposes a fine, goes right into his own pocket. That's the kind of situation that the Supreme Court has said raises a concern. Now, here, nothing in terms of the bonus turns at all on the outcome of the decision. These bonuses simply reward people who are working hard and doing good work. Their argument is that the number of cases, not the outcome, but just the number and, therefore, the decision to grant, to institute. But let me ask you another question that I've been worrying about ever since the AIA was decided by the director, not by the tribunal. And early in the proceedings, as I understand it, that step was delegated by the director to the tribunal. And ever since then, we see here from their concerns that that is a distortion of the standard PTO examining core. We take the first look at the case for which now review, say IPR, is being requested and decide on some, I think the hearings use the term probable cause, decide whether it is probable cause to take another look. And the argument of the other side, I think their best argument, at least most forceful, is that to turn that threshold step, which was supposed to protect patentees because of the difference of the burden of proof and a lot of other things which happen on this step is now delegated to the same tribunal that's supposed to objectively decide the merits. And that there is some sort of inherent bias, at least towards granting the institution request. And we all know that these are burdensome, extremely expensive proceedings that are, for whatever reason, imposed on patentees. And so that's a long return to my initial question, which is how does the office justify that they have delegated the initial threshold institution step to the final decision maker? So, Your Honor, this court rejected in Ethicon the argument that there is a problem with having the APJ decide both stages. And this court said this is just like a judge deciding both the preliminary injunction stage and the final merit stage. There are also a lot of incentives in this process to issue good decisions, right? Poor quality decisions are going to mean worse performance reviews. You have a statute which is contrary to the way it's being implemented. You have a statute which says that the director will see to the initial institution stage, not the tribunal. And you're telling us, well, it's okay for the tribunal to do it because they're honest people. That's not my question. My question is the departure from the statute where, as according to the record of the eight years of chewing this over that went on in the legislative process, that this was an important aspect of the enactment. Yes, but please answer the question if you can. Yes, Your Honor. So, nothing in the statute bars the director from delegating these institution decisions, but this case isn't about the director's authority to delegate. We haven't briefed that question. This question is about due process. And they make a very strong argument that they're not getting due process because of the incentives of the board, constituted board, to grant institution petitions. This is Judge Dyke. Could I bring you back to that question? There are two contentions here that I'd like you to address in that respect. One is they say that the number of decisional units that you get in X party is less than the decisional units that you would get for an IPR final written decision. Is there anything in the record about that? I do not... It includes the additional material that's been submitted. Yes, Your Honor. That is in the supporting document to the performance reviews. I'm not sure that that is in the documents that Mobility Works requested judicial notice. But the key here is you do get less credit for an X party appeal, but that is because the X party appeal is less work. And the goal is to reward not every decision the same, but every amount of work the same. What's the difference? Yes, sure. So an IPR, it's issued after there's a full trial. And then in writing that decision, the APJ... What's the difference in terms of number of units? I'm sorry, Your Honor. I don't have that information in front of me. I think it's in the record that you provided us. Isn't the difference one unit for the reexamination as against four for a decision on an IPR? It's somewhere in the record, I think. That may very well be correct. That matches my memory of it. Of course, to the extent that what we're talking about are facts, that does bring us back to the importance of building that factual record before the agency, which didn't happen here. But the point is that these decisional units are assigned to reward equal amounts of work equally. So an X party appeal is much less work than an IPR where the judge holds a trial and then it's usually a lengthy decision dealing with all of the evidence in the trial. And that's why those cases earn more decisional units. But we are just not in a situation where there is any judge on the PPAD who can't get enough work to... Okay. Let me ask you to address that. The contention seems to be that APJs assigned to post-grant proceedings somehow can't get X party appeals if they run out of work. Is that the case? No, that's incorrect. You'll see that in page five of the standard operating procedures. It says, to request X party appeals to be added to his or her docket, a judge who is assigned to be paneled on cases in other jurisdictions of the board should contact a designee to request a certain number of X party appeals up to the designated maximum workload. So that's simply incorrect. You can always get X party appeals if you would like them. APJs also do other kinds of work for which they get credit, such as rulemaking and outreach. So an APJ always has ample opportunity to get the necessary number of decisional units. And it's also... I think there's sort of a misunderstanding here that these trials are less work. It is a lot of work to have a trial and to write an opinion that addresses all of the evidence in the trial. But explain to us why this requires the bonus. Here we have people operating at the maximum of the executive service and are paid a salary. And they make a large point in particularly their amicus with statistical support for the incentive to proceed, to balance perhaps close cases in favor of institution. And they certainly do raise the question of having a different... of having the same entity make the institution decision as do the adjudication. And you're saying that you're not prepared to respond to that? I'm saying this court has already in Ethicon addressed the question of whether there's some kind of due process problem by having the APJs make the initial decision. You have nothing else to say beyond what was in Ethicon? So I may not be understanding the question. I'm trying to understand the difference. I think that there is a significant due process concern, particularly when it's in direct contravention of the Act of Congress, in which the decision whether to take on a case, again, the decision of probable cause is... and the final decision maker are the same when they were set up by statute to be different. That's my problem. That's my question. So nothing in the statute prevents the director from delegating this? They're saying due process prevents the director. Of course, the director personally isn't going to read these petitions. We understand that. But there's an enormous core of experienced examiners, and it was contemplated that the examiners, I suppose more likely than not, certainly in the same art unit, so an examiner with a technological background, perhaps the examiner who examined it in the first place, would take a look and see if there's a question, a significant question, enough to pull this patent, which is issued, out of circulation, essentially, and put it through this judicial process in the hands of experts. And this is where the delegating that operation to the same entity that conducts the trial and makes the final decision was explicitly avoided in the American Vents Act. And this is where I'm having trouble understanding how due process was as well served by the way it is handled now as the way it was intended to be set up. So Ethicon tells us there's no due process problem. There are also, through the performance review process, somebody who is issuing poor quality decisions is going to get a performance review. I didn't ask about performance. I'm really trying to understand what I find to be the most troublesome issue and one with due process implications, and is pressed particularly, again, by the amicus with statistical data. So I would like to address that statistical data. It comes from an amicus brief asserting that patent holders are more likely to win cases that are instituted in October than in September. It's important to understand what that brief does not say. It does not say that more cases are instituted in one month or another. That's not true. Okay, so you don't want to answer my question? So I have several answers to your question, Your Honor. I do think that it is important to note that that statistical evidence does not show a problem. Is the question that Judge Newman has asked you about raised in this case by the patent holder? No, Your Honor. It is not raised in this case, and we haven't briefed the director's authority to delegate here. If the court would like to call for a supplemental brief on that, we can, but it has not been raised. I do believe that the due process problem is foreclosed. The due process argument, there is no due process problem, is foreclosed by this court's decision in Ethicon, saying that the same APJ can decide both stages, just like a federal judge can decide both the preliminary injunction phase and the final merits decision. And then, you know, the facts here really belie an argument that there is some kind of pressure on APJs to institute. Let me ask you another question. My impression, and I'm not sure whether this is in the briefs here, is that throughout the federal government that administrative judges can earn performance bonuses by the amount of work that they do. Am I correct about that, or is that not correct? I do believe that it is correct. Many federal employees can get bonuses for doing more work, and the APJ performance review process is very similar to the performance review processes of other federal employees. Wait, wait. I wasn't asking about other federal employees. I was asking you about other administrative judges in other parts of the government. Do we know whether they get performance bonuses, which depend on productivity? I do not know the precise bonus structure for other APJs, I mean for other ALJs. But if you look at what has actually been happening with institutions, there's policy guidance, a lot of which, you know, some serves to increase institutions, but a lot of that policy guidance, like offensive factors, actually lead to fewer institutions. And we're in a situation where petitions are going up and institutions are going down. So we don't see a system. The facts just do not support that this is a system that encourages unnecessary institutions. And that performance review process, you know, one factors productivity, the other three relate to performance. If APJs were instituting cases unnecessarily, they would be getting worse performance reviews, and it would not be a way to get to the highest bonus. Another thing about this system with the decisional units is that that system was designed because PTAB was trying to clear a backlog. And if there were not a lot of work that PTAB was trying to get through, there didn't used to be a threshold for the top levels of decisional units for bonuses. You can see that at J3622, and by comparing 3631 through to 3891, which was the old performance review, which did not have numerical thresholds for the top numbers. And if we were, again, in a world where PTAB was not trying to clear through a big backlog, there's no basis for thinking that PTAB wouldn't revise its bonus factors to continue to reward the people who were working hard and doing good work. But there's just no constitutional problem with a policy that says you have to do a certain amount of work to get a bonus. If there are no further questions. Any more questions from Ms. Gershwin? No. No. Okay. All right. Mr. Mudd, the appellee. May it please the court, Jason Mudd for Unified Patents. I would like to address the triggering limitation of the 417 patent, which is the only argument on the merits of the board's unpatentability determination that was raised by the appellant, Mobility Works. First, I note this limitation only applies to claims 1, 2, 4, and 5 of the board's determination. Mobility does not challenge the merits as to claim 7. That determination should be affirmed. Second, the court should find that Mobility's argument on the triggering limitation is waived. As Mobility admits on page 59 of its opening brief, Mobility did not present arguments relative to this limitation before the board. Third, even if the court were to entertain this new argument, the board correctly found this limitation was satisfied by the Lu reference, and that finding is supported by substantial evidence. The board correctly found that Lu's M-Agent, which it found to be the ghost mobile mode, that Lu's M-Agent handles pre-assignment signaling on behalf of the mobile device to prearrange services and initiate mobility on behalf of the mobile device. The board also correctly found that the M-Agent does so based on a predicted physical location of the mobile device. This is what Lu refers to as PMM, or Predictive Mobility Management. These findings are in the board's final written decision at pages 30 to 31 of the appendix. Lu's M-Agent acts as a proxy for the mobile terminal, as the board found. The M-Agent sends a pre-assignment request on behalf of the mobile terminal to the foreign network, and in that manner, the M-Agent triggers signals on behalf of the mobile terminal. The M-Agent triggers those signals based on a predicted physical location provided to it by the mobile terminal. Now, Mobility may be correct that the predicted location is determined by the mobile device itself rather than the M-Agent, but nothing in the claim language requires that the GHOST mobile node must itself determine the predicted location. Instead, the signaling need only be based on a predicted location of the device, regardless of how that predicted location is determined. So in Lu, the mobile terminal may be what predicts its future location and provides that location to the M-Agent, but it is the M-Agent that actually registers the pre-assignment request and sends that request to the foreign network, specifically to an MF-Agent manager in the foreign network. Now importantly, the mobile terminal has not yet traveled to or registered with the foreign network at its predicted future location, so the mobile terminal cannot yet itself signal the foreign network. The M-Agent has to act as a proxy for the mobile terminal. So the M-Agent is what actually triggers the signaling because the M-Agent communicates on the network on behalf of the mobile terminal before it reaches its destination. Now mobility dismisses this point as a red herring in footnote 10 on page 27 of its required brief, but it's most certainly not a red herring. It is the whole reason that the M-Agents must trigger the actual signaling to the foreign network because the M-Agent is the entity that's already in communication with the foreign network and is able to handle pre-assignment signaling. The mobile terminal has not yet been assigned to a router in the foreign network, so it cannot communicate with the foreign network on its own behalf yet. Instead, the mobile terminal cannot trigger the signaling. Instead, the M-Agent does so on the mobile terminal's behalf. Thus, the board's finding that lose M-Agent triggers signaling on behalf of the mobile node based on a predicted location is supported by substantial evidence and should be affirmed. If there are no questions on that limitation, I'll briefly touch on two of the additional constitutional questions that have been raised. The first was a question as to under ARTHREX. For the first time on appeal, mobility raises an issue that under ARTHREX, the board's institution decision is unconstitutional. First, that argument was waived, but second, in any event, under both ARTHREX itself and this court's decision in the Caterpillar case, that argument is foreclosed by precedent. There is no issue with the institution decision. And here, the final written decision was entered after the ARTHREX case. And then the other issue raised was a Fifth Amendment takings argument. For the first time on appeal, mobility argues that a pre-AAA patent, subjecting it to an IPR proceeding is an unconstitutional taking. First, that argument was waived. Second, in any event, that argument, too, has already been rejected by this court's precedents, specifically in the Celgene v. Peter case. The court held that... Okay, you can finish the sentence. Okay, thank you, Your Honor. This court held that IPR proceedings under the AIA do not sufficiently differ from reexaminations so as to constitute a Fifth Amendment taking. Okay. Any questions for Mr. Mudd? No. Nope. Hearing none. All right, Mr. Randall, you have your rebuttal time. Are you there? Are you muted? Can you hear me, Your Honor? I hear you now. Thank you. So mobility did raise the issue of whether or not the decision makers that decide the institution decision should be different than the decision makers that hear the trial phase and the final hearing and raise the constitutional issue with respect to that. We recognize that Ethicon is contrary to that position, but we also would... Did you raise that in your opening brief? We did raise that in our opening brief, Your Honor. But what we would also say is that... Could you show me where you raised it in your opening brief? Yes, give me one second. So the issue was number two, whether the director's delegation of his responsibility to make final unreviewable institution decisions to the same APJs who make the final written decisions violates the Administrative Procedures Act and or the Due Process Clause of the Constitution. That's on page four of our opening brief. Okay, proceed with your argument. So what Mobility would say, Your Honors, is that Ethicon was not decided at a time when it had the information available that Mobility has now uncovered through the U.S. inventor's FOIA request, which indicate a high degree of temptation to institute to satisfy not only the APJ's own personal interest in making sure the APJ has sufficient decisional units available to him, but also to satisfy the PTAB's budgetary constraints. The director at APX 4335 through APX 4338, the director issued his final rules setting and adjusting patent fees through the fiscal year 2020 and beyond. And if you look at that spreadsheet, basically at columns K and N and rows 296, 297, and 298, the director basically budgets institution rates at 66%. And so the management of the PTAB, including the vice chairs that decided the institution decision in this case, understand that they have to, in order to meet budget, to hit a 66% institution rate. And that also runs through for years on the next page at APX 4336 for the years 2022 through 2024. So the director is consistently budgeting an institution rate of 66%, and that is what the APJ's are trying to hit. And you see that in the numbers. And we know that institution leads to potentially a pre-bias issue that Judge Newman raised in Ethicon. And that judges that have already decided the issues are less likely to reconsider their decisions. Okay, please finish the thought. That's all I have, Your Honor. Okay, any questions for Mr. Randall? No. No. All right, in that case, our thanks to all counsel. The case is taken under submission.